UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

| | | |
|---|---|---|
| JOSEPH CHALIFOUX, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | |
| BAE SYSTEMS, INC. and ATR | ) | |
| INTERNATIONAL, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**COMPLAINT**
**JURY TRIAL REQUESTED**
**<u>INJUNCTIVE RELIEF REQUESTED</u>**

NOW COMES the Plaintiff, Joseph Chalifoux, by and through undersigned counsel, and complains against the Defendants, BAE Systems, Inc. ("BAE") and ATR International, Inc. ("ATR"), as follows:

<u>INTRODUCTION</u>

1. This action arises under the False Claims Act (31 U.S.C. § 3730); the Fair Labor Standards Act (29 U.S.C. § 215); New Hampshire's Whistleblower Protection Act (RSA 275-E:1 *et seq.*); and New Hampshire common law.

2. Defendants retaliated against Mr. Chalifoux because he engaged in protected activity under these statutes and because he engaged in activity encouraged by public policy.

<u>PARTIES</u>

3. Mr. Chalifoux is a United States citizen residing in New Ipswich, New Hampshire.

4. BAE is a defense contractor that, at all times material to this case, supplied many different agencies within the U.S. Department of Defense ("DoD") with equipment, weaponry, and machines.

5. BAE is incorporated in Delaware and its principal place of business is in Arlington, Virginia.

6. BAE has operations all over the world including in Nashua, New Hampshire.

7. ATR is a staffing agency through which Mr. Chalifoux obtained a position at BAE's Nashua, New Hampshire, location.

8. ATR is incorporated in California and its principal place of business is in California.

9. At all relevant times, BAE and ATR jointly employed Mr. Chalifoux while he worked for BAE in Nashua, New Hampshire.

## JURY TRIAL DEMAND

10. Plaintiff requests a trial by jury on all issues triable to a jury.

## JURISDICTION

11. The amount in controversy in this matter exceeds $75,000.

12. This Court has subject matter jurisdiction over Mr. Jacques' federal and state claims under 28 U.S.C. §§ 1331, 1332, and 1367.

## FACTUAL ALLEGATIONS

13. From March 1, 2018, to May 22, 2018, Mr. Chalifoux worked for BAE in Nashua, New Hampshire.

14. During this period, he was jointly employed by BAE and ATR.

15. At all times while Mr. Chalifoux worked for BAE, BAE managers directed his work duties including when he worked, the number of hours he worked, how he performed his job, where he performed his job, and what work he could do.

16. While he worked at BAE, ATR paid Mr. Chalifoux's wages based on the number of hours that BAE told ATR Mr. Chalifoux had worked each pay period.

17. Mr. Chalifoux worked for BAE as a Technical Recruiter and the employees he recruited worked on projects where products were produced for a variety of DoD agencies pursuant to contracts BAE had with DoD.

18. Before BAE hired Mr. Chalifoux, he interviewed with BAE employees Alina Ernest and Robert Fraraccio. He also met with some recruiters employed by BAE.

19. BAE had a practice of employing Technical Recruiters from staffing firms like ATR and those Technical Recruiters who performed their jobs well would get converted by BAE to permanent BAE employees. One of the BAE recruiters that Mr. Chalifoux met with during the interview process had gotten her job that way.

20. BAE hired Mr. Chalifoux to a 12+ month contract with the opportunity to become a permanent BAE employee.

21. Throughout Mr. Chalifoux's employment with BAE, Ms. Ernest served as his supervisor.

22. During the hiring process, Ms. Ernest told Mr. Chalifoux that, if he was hired, he would have minimal supervision, would not be "micromanaged," and that he would have opportunities to work overtime.

23. BAE hired Mr. Chalifoux and scheduled him to start working on March 1, 2018.

24. Mr. Chalifoux learned shortly after he started to work for BAE that he could work a schedule of 9 days and 80 hours every two weeks. Mr. Chalifoux took advantage of this schedule. Under this schedule, Mr. Chalifoux had a day off every other Friday and he could work from home when he worked on Fridays.

25. On March 27, 2018, Mr. Chalifoux emailed Ms. Ernest about a request he had made for approval to work overtime. He asked if he could work about 45 hours per week. Ms. Ernest replied to his email that same day and said that he could work overtime so long as he did so in the office, as opposed to at home.

26. Mr. Chalifoux's primary job duty as a Technical Recruiter was to close requisitions, or "reqs." He closed reqs by recruiting applicants for open positions and processing them through BAE's hiring process.

27. During Mr. Chalifoux's time working for BAE, he closed somewhere around 52 reqs.

28. Mr. Chalifoux's req closing rate was very high, especially for someone like him who was new to BAE.

29. BAE assigned Mr. Chalifoux more reqs than many other recruiters because he was doing such a good job.

30. On April 12, 2018, Mr. Chalifoux had an email exchange with Ms. Ernest where she told him that he was "doing great" with his work and she had her "fingers crossed" that he would get converted to a permanent BAE employee.

31. Ms. Ernest was the principal person who would decide whether Mr. Chalifoux got converted to permanent BAE employee status. She made recommendations and requests for contractors who she supervised to be converted to permanent employee

status. As such, Mr. Chalifoux considered Ms. Ernest's email on April 12, 2018, to be a very good sign.

32. One of the reqs assigned to Mr. Chalifoux was req number 36917BR. This req was for a Process Tech 1 position. A Process Tech 1 assisted technical operations staff with things like researching and procuring materials for the production floor, entering data on preventative maintenance completions, and maintaining records on equipment.

33. The hiring manager that Mr. Chalifoux worked with on req number 36917BR was Sharon Stehlik.

34. Mr. Chalifoux sent Ms. Stehlik a number of qualified applicants for this req but she only reviewed the information for one applicant.

35. Mr. Chalifoux knew that Ms. Stehlik only reviewed the information for this one applicant because (a) he could tell from the computer system that she did not access any other applicant's information and (b) Ms. Stehlik made it clear that she was focused on hiring a specific person for the job.

36. Ms. Stehlik told Mr. Chalifoux that she wanted to hire a particular applicant with the initials J.B. for req 36917BR.

37. Ms. Stehlik was extremely focused on getting Mr. Chalifoux to process J.B. through the system and even called Mr. Chalifoux from her cell phone during off hours about her desire for Mr. Chalifoux to do so.

38. J.B. was far less qualified for the Process Tech 1 position than some of the other applicants that Mr. Chalifoux sent to Ms. Stehlik for her review.

39. Ms. Stehlik told Mr. Chalifoux that J.B. was a pizza deliverer.

40. J.B.'s application materials indicated that he was a security guard with very little, if any, relevant experience, and no college degree.

41. An applicant with the initials T.A. was one of the applicants who was far more qualified than J.B. T.A. had years of relevant experience and a master's degree.

42. J.B. also did not identify himself as a referral in his application, which seemed odd to Mr. Chalifoux.

43. Ms. Stehlik hired J.B. for the position without considering any of the other applicants for the position.

44. BAE was required to comply with certain hiring policies under federal law because BAE was a government contractor. BAE's contracts with DoD required them to follow these hiring policies. Mr. Chalifoux believed that Ms. Stehlik violated federal law, as well as company policy, with respect to req 36917BR.

45. 41 C.F.R. §§ 60-300.5 and 60-1.4 describe certain obligations BAE had to comply with under the Vietnam Era Veterans' Readjustment Assistance Act (VEVRA) and Executive Order 11246. These regulations required that BAE agree, as a condition of contracting with the federal government, not to discriminate against certain protected classes of people and to use affirmative action to employ those protected classes of people.

    a. These regulations require, among other things, all contracts BAE had with the federal government to include an "equal opportunity clause" which BAE must follow when it hires employees. This equal opportunity clause includes a requirement that "all qualified applicants will receive consideration for employment" by BAE.

b. These regulations also require BAE to grant the U.S. Department of Labor access to its records for purposes of ascertaining compliance with the equal opportunity clause.

46. Mr. Chalifoux thought Ms. Stehlik's handling of req 36917BR violated these regulations since "all qualified applicants" for that position did not receive consideration for employment. Also, some of the applicants Ms. Stehlik did not consider were veterans and, even though J.B. was in the Reserves, Mr. Chalifoux thought Ms. Stehlik violated these other applicants' rights to affirmative action for veterans by not considering them.

47. On Thursday, April 26, 2018, Mr. Chalifoux spoke on the phone with Ms. Ernest to discuss his concerns with how Ms. Stehlik handled req 36917BR. He told Ms. Ernest that he thought Ms. Stehlik had violated federal law and company policy because she focused solely on one applicant, did not consider other qualified applicants who were veterans, and passed over more qualified applicants so she could hire J.B.

48. Ms. Ernest agreed with Mr. Chalifoux, when they spoke on April 26, 2018, that Ms. Stehlik acted improperly in her handling of req 36917BR.

49. Mr. Chalifoux's complaints about Ms. Stehlik's actions constituted protected activity under the FCA.

a. Mr. Chalifoux reasonably believed that, to receive payment under or secure contracts with the federal government, BAE either expressly or impliedly represented to the federal government that it complied with the equal opportunity

clauses of its federal contracts when, in fact, BAE knew that it was not complying.

  b. Mr. Chalifoux reasonably believed that these false representations violated the FCA.

  c. Mr. Chalifoux reasonably believed that certification of compliance with the equal opportunity clauses, either implied or express, was necessary as a precondition for BAE to receive payment under these federal contracts.

  d. Mr. Chalifoux's complaints regarding BAE's failure to comply with the equal opportunity clauses of its federal contracts were steps that he reasonably believed could lead to an action under the FCA.

50. On Friday, April 27, 2018, Ms. Ernest sent Mr. Chalifoux an email in which she questioned whether he had worked all of the hours that he submitted on his timecard.

  a. Ms. Ernest said that she thought Mr. Chalifoux had an eye doctor appointment and another appointment that week which were not reflected as missed time on his timecard.

  b. She also said that Mr. Chalifoux's instant messenger (IM) indicated he was away for two hours that day.

  c. This was the first time Ms. Ernest had ever questioned whether Mr. Chalifoux had worked the number of hours that he had reported on his timecard.

51. Mr. Chalifoux spoke to Ms. Ernest regarding her April 27, 2018, email. They discussed, among other things, the following:

  a. Mr. Chalifoux told Ms. Ernest that he worked all of the hours that he submitted on his timecard.

b. Ms. Ernest said that the IM indicated that Mr. Chalifoux was away; she said people were trying to get ahold of Mr. Chalifoux and could not.

c. Mr. Chalifoux asked Ms. Ernest who had tried to contact him and could not get ahold of him but she refused to identify anyone.

d. Mr. Chalifoux told Ms. Ernest that he used handwritten notes to keep track of his work and he also spoke to people on the phone, and both of those activities would result in his computer being inactive for a while.

e. With respect to the medical appointment, Mr. Chalifoux told Ms. Ernest that there was only one medical appointment (a dentist appointment) and he worked outside his normal schedule that day to make up for the time that he missed for that appointment.

52. On April 30, 2018, despite the explanation that Mr. Chalifoux gave Ms. Ernest for the entries on his timecard, Ms. Ernest deducted hours from his timecard. That same day, Ms. Ernest also revoked Mr. Chalifoux's work-from-home privileges.

53. Mr. Chalifoux emailed Ms. Ernest on April 30, 2018, and told her, again, that he had worked all of the hours that he submitted on his timecard but not all of the time was spent on the computer. He told Ms. Ernest that he could provide a detailed log of his activities for the day in question but he would need time to compile it.

54. Ms. Ernest docked Mr. Chalifoux's pay and never took him up on his offer to provide her with a detailed log of his activities.

55. Mr. Chalifoux reasonably believed that, by refusing to pay him for all of the wages he was owed, Ms. Ernest and BAE violated his rights under state wage and hour laws including RSA 275:43.

56. Ms. Ernest's claim that people could not reach Mr. Chalifoux on April 27 was false. Even if Mr. Chalifoux was not responding to IM, he was reachable by phone or text message. Ms. Ernest regularly texted Mr. Chalifoux on his phone.

57. On May 1, 2018, Ms. Ernest explained in an email to Mr. Chalifoux that she had revoked his work-from-home privilege because he had not been working for multiple hours while he was at a home, which was not true.

58. Mr. Chalifoux thought Ms. Ernest had retaliated against him for complaining about Ms. Stehlik's unlawful actions relating to req 36917BR. So, he spoke to Jennifer Boyd, a Human Resources Business Partner at BAE, and shared his concerns with her.

59. Mr. Chalifoux spoke to Ms. Boyd on the phone on or about May 4, 2018, and he emailed her on May 8, 2018.

60. During his phone call with Ms. Boyd on or about May 4, 2018, and in his email to her on May 8, 2018, Mr. Chalifoux told Ms. Boyd, among other things, that (a) he thought he had been retaliated against for reporting the unlawful handling of req 36917BR and (b) his pay had been unlawfully reduced.

61. On May 9, 2018, Mr. Chalifoux emailed Michael Gonzalez at ATR. This email discussed the same points that Mr. Chalifoux raised in his May 8, 2018, email to Ms. Boyd. Among other things, Mr. Chalifoux asked ATR to protect him from further retaliation by BAE.

62. On May 10, 2018, upon the recommendation of Ms. Boyd, Mr. Chalifoux emailed Ms. Ernest regarding her unlawful decision to not pay him for hours that he had worked and her decision to revoke his work-from-home privileges. Mr. Chalifoux's

email exchange with Ms. Ernest continued into May 11, 2018, and he cc'd Ms. Boyd on his May 11, 2018, email to Ms. Ernest. ATR was also provided with this email exchange between Ms. Ernest, Ms. Boyd, and Mr. Chalifoux.

63. On May 10, 2018, Shirlyn Santos, HR Specialist with ATR, emailed Mr. Chalifoux to ask for more information about the hours that he should have been paid for as well as for any additional information that he had regarding the other issues that he raised in his email to Mr. Gonzalez. Mr. Chalifoux replied to her email that same day with information about the hours he was not paid for and information about another contractor who was permitted to work remotely. He told her that there was another instance when he worked 3.5 hours of overtime and was not paid. Mr. Chalifoux also asked Ms. Santos for a copy of ATR's contract with BAE since Ms. Boyd and Ms. Ernest had cited that contract as one of the alleged reasons why BAE had revoked his work-from-home privileges.

64. Mr. Chalifoux's complaint about not getting paid 3.5 hours of overtime constituted protected activity under FLSA.

65. On May 11, 2018, Ms. Ernest again questioned the accuracy of the hours that Mr. Chalifoux put on his timecard. She said in an email that he was not working one day from 9:45 to 11:25 because he left work to get some medicine. Mr. Chalifoux replied to this email and indicated that his hours for that day were correct because, even though he had to leave for a short time to get some medicine (not the amount of time she indicated), an applicant had unexpectedly called him after normal work hours.

66. Mr. Chalifoux also sent an email to Ms. Ernest, with a cc to Ms. Boyd, on May 11, 2018, which provided Ms. Ernest with further detail on why he thought it was unlawful and unfair for her not to pay him for all hours he had worked and to revoke his ability to work from home. In this email, Mr. Chalifoux referenced his April 26, 2018, conversation with Ms. Ernest about how Ms. Stehlik had unlawfully handled req 36917BR.

67. On May 14, 2018, Annie Eller, HRBP with ATR, emailed Mr. Chalifoux and informed him that she had spoken to Ms. Boyd regarding the concerns that Mr. Chalifoux had communicated to ATR.

68. On May 14, 2018, BAE HR Analyst Clairise Tillman emailed Mr. Chalifoux and asked him to enter the database disposition codes for req 36917BR.

69. One of the reasons Mr. Chalifoux was worried about how Ms. Stehlik handled req 36917BR was because his job required him to enter a disposition and reason code for each candidate for that position into a database.

70. These disposition and reason codes described the reason why the candidate was not selected for hire. There were certain defined disposition and reason codes and, since J.B. was not the most qualified applicant, if Mr. Chalifoux had entered a disposition and reason code for some of the other applicants, those codes would have been false. Entering false codes would have created a false record which would cover up BAE's failure to comply with the equal opportunity clauses in its contracts with the federal government.

71. On May 14, 2018, Mr. Chalifoux forwarded Ms. Tillman's email to Ms. Ernest. He told Ms. Ernest that Ms. Tillman's email related to the req that he worked on with

Ms. Stehlik (req 36917BR) which made him uncomfortable. He told Ms. Ernest that he had coded the non-selected applicants in the database as "Not Selected" but he did not see an appropriate reason code in the drop box for the non-selection. So, Mr. Chalifoux told her that he had just not selected a reason code and that was all he was willing to do.

72. Ms. Ernest emailed Mr. Chalifoux back on May 14, 2018, and ordered him to select a reason code and told him that he could select "met basic qualifications, not most qualified." Ms. Ernest knew as well as Mr. Chalifoux did that this reason code was not true and, as such, Mr. Chalifoux refused to enter this false reason code because he thought it would be unlawful to create a false record that the federal government might see if it investigated whether BAE had complied with its equal opportunity obligations.

73. Mr. Chalifoux's opposition to entering a false code which would have covered up BAE's non-compliance with the equal opportunity clauses in its contracts with the federal government constituted protected activity under the FCA. Entering the false code was an action that Mr. Chalifoux reasonably believed could have led to a FCA claim.

74. On May 21, 2018, Mr. Chalifoux emailed Ms. Eller, with a cc to Ms. Santos, to recap what had happened in the two weeks since he contacted ATR about the retaliation he had experienced for reporting unlawful activity. Mr. Chalifoux wanted to know what ATR was going to do to protect him from further retaliation because it did not appear as though it had done anything up to that point.

75. On May 22, 2018, a recruiter contacted Mr. Chalifoux and presented him with a potential job that was exactly the same job Mr. Chalifoux held at BAE. This made Mr. Chalifoux fear that a decision had been made to terminate his employment and they were already looking to fill his position.

76. Later on May 22, 2018, Mr. Chalifoux participated in a conference call with all of Talent Acquisition at BAE. The Director, Kelly Dunn, ran this conference call.

77. During this conference call, Ms. Dunn said, among other things, that BAE realized contractors were the same as BAE non-exempt employees and should be treated accordingly. So, she said, contractors were "no longer" going to be permitted to work from home. Her statement confirmed that, up until that point, contractors were generally allowed to work from home.

78. Around 4:30pm on May 22, 2018, Mr. Chalifoux found a note from Ms. Boyd on his desk asking him to come meet her in her office. When Mr. Chalifoux got to Ms. Boyd's office, Ms. Boyd closed the door and indicated that Ms. Eller was on speakerphone.

79. During this May 22, 2018, meeting with Ms. Boyd and Ms. Eller, the following points were discussed.
    a. Ms. Boyd said that Mr. Chalifoux's complaint about the hiring of J.B. had been investigated and it was determined that J.B. was the most qualified applicant for the position.
    b. Mr. Chalifoux told Ms. Boyd that J.B. was most definitely not the most qualified; there was at least one applicant with a master's degree, applicants who worked in the industry, even internal BAE applicants who were more qualified.

c. Ms. Boyd said that those other applicants were "too qualified" for the position.

d. This explanation was absurd since there was no maximum level of qualifications or experience specified in the req. Also, Mr. Chalifoux knew that the reason the others were not selected was because Ms. Stehlik did not consider all the applicants since she just wanted to hire J.B. for the position.

e. Ms. Boyd also said that Mr. Chalifoux had started working at 6:00am on the day when he had a dentist appointment and Ms. Ernest had instructed him not to come into work that early without getting permission from her.

f. Mr. Chalifoux told Ms. Boyd that Ms. Ernest did not tell him not to come into work early without getting permission from her. He told Ms. Boyd that Ms. Ernest had said he should not work overtime (i.e., not to work more than 80 hours every two weeks) without asking her first but Ms. Ernest never said anything about starting early.

g. Ms. Boyd then said that Mr. Chalifoux was clearly not happy with the hours required for the job and wanted more flexibility.

h. Mr. Chalifoux told Ms. Boyd that what she said about him being unhappy with the hours required for the job and wanting more flexibility was not true. He told her that he just wanted to be treated like everyone else in his position. He had complied with Ms. Ernest's schedule and work location requirements even though he thought they were unlawfully retaliatory.

i. Ms. Boyd then said that Mr. Chalifoux was terminated and that this would be his last day.

15

80. Ms. Eller and ATR did nothing to help protect Mr. Chalifoux from BAE's unlawful retaliation because it adopted the same retaliatory animus as its client, BAE.

81. Recruiters similarly situated to Mr. Chalifoux who did not oppose unlawful activities regularly worked outside of normal business hours without seeking permission. These recruiters were allowed to flex their schedules. For example, they could start working at 6:00am, later than 6:00am, or earlier than 6:00am if they wanted.

82. Mr. Chalifoux engaged in protected activity as defined under FLSA when he complained about not receiving overtime pay he had earned.

83. Mr. Chalifoux engaged in protected activity as defined under the New Hampshire Whistleblower Protection Act when he complained about FCA violations related to BAE's violations of the equal opportunity requirements in its contracts with the federal government, violations of the FLSA, and violations of New Hampshire wage and hour laws which require timely payment of wages earned.

84. Mr. Chalifoux engaged in activity that public policy encourages when he complained about BAE's unlawful activities.

85. As a result of Defendants' violations of Mr. Chalifoux's rights, he suffered damages including, but not limited to, lost wages, lost employee benefits, and loss of enjoyment of life.

## COUNT I: False Claims Act

86. Paragraphs 1-85 are incorporated by reference.

87. Defendants' conduct violated the anti-retaliation provisions of the FCA.

## COUNT II: Fair Labor Standards Act

88. Paragraphs 1-87 are incorporated by reference.

89. Defendants' conduct violated the anti-retaliation provisions of the FLSA.

### COUNT III: New Hampshire Whistleblower Protection Act

90. Paragraphs 1-89 are incorporated by reference.

91. Defendants retaliated against Mr. Chalifoux because he, in good faith, reported what he reasonably believed were violations of laws and rules adopted under the laws of New Hampshire, a political subdivision of New Hampshire, and/or the United States.

### COUNT IV: Wrongful Termination

92. Paragraphs 1-91 are incorporated by reference.

93. Defendants wrongfully terminated Mr. Chalifoux's employment in violation of public policy because he took actions that public policy would encourage, namely, for reporting concerns of unethical and illegal practices. *Cloutier v. Great Atlantic & Pac. Tea Co., Inc.*, 121 N.H. 915 (1981).

94. Defendants' wrongful termination of Mr. Chalifoux was motivated by bad faith, retaliation, and malice. *Wenners v. Great State Beverages*, 140 N.H. 100, 103 (1995) *cert. denied*, 516 U.S. 1119 (1996).

### PRAYER FOR RELIEF

Plaintiff respectfully requests that the Court grant the following relief:

A. Declare the conduct engaged in by Defendants to be in violation of his rights;

B. Enjoin Defendants, their agents, successors, employees, and those acting in concert with them from continuing to violate his rights;

C. Order Defendants to reinstate Plaintiff or award front pay to Plaintiff;

D. Award lost future earnings to compensate Plaintiff for the diminution in expected earnings caused by Defendants' violations of his rights;

E. Award equitable-relief for back pay, lost benefits, and prejudgment interest;

F. Award compensatory damages in an amount to be determined at trial;

G. Award punitive damages in an amount to be determined at trial;

H. Award enhanced compensatory damages in an amount to be determined at trial;

I. Award liquidated damages;

J. Award nominal damages;

K. Award attorney's fees, including legal expenses, and costs;

L. Award prejudgment interest;

M. Permanently enjoin Defendants from engaging in any employment practices which violate the laws that they violated in this case;

N. Require Defendants' CEOs to mail letters to all employees notifying them of the verdict against them and stating that Defendants will not tolerate retaliation in the future;

O. Require that Defendants post a notice in all of their workplaces of the verdict and a copy of the Court's order for injunctive relief;

P. Require that Defendants train all management level employees on the protections afforded by the laws that they violated in this case;

Q. Require that Defendants place documents in Plaintiff's personnel files which explains that Defendants unlawfully retaliated against him; and

R. Grant to Plaintiff such other and further relief as may be just and proper.

|  |  |
|---|---|
|  | Respectfully submitted, |
| Dated: April 1, 2020 | */s/* Allan K. Townsend |
|  | Allan K. Townsend<br>NH Bar No. 269356<br>Attorney for the Plaintiff |
|  | EMPLOYEE RIGHTS GROUP<br>92 Exchange Street 2nd floor<br>Portland, Maine 04101<br>Tel. (207) 874-0905<br>Fax (207) 874-0343<br>Allan@EmployeeRightsLaw.Attorney |